IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FILED
DEC 2 2003
CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| COOSADA TRUCKING COMPANY, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) CIVIL ACTION NO. 01-F-553-N ) |
| CIT FINANCIAL, USA, INC., f/k/a NEWCOURT FINANCIAL, USA, INC., | ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

The plaintiff, Coosada Trucking Company, Inc., (hereinafter "Coosada") filed this civil action alleging numerous state law claims against CIT Financial, USA, Inc., (hereinafter "CIT") on May 4, 2001 (Doc. # 1). Plaintiff contends that it was wrongfully overcharged when it paid off its debt on six loans held by CIT and seeks compensatory and punitive damages. Jurisdiction is invoked pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).[1]

On March 5, 2003, this court entered an order striking Plaintiff's jury demand as to four of the six loans at issue (Doc. # 69). As the court noted in said order, "as a result of [the] rulin[g]," the court was faced with "unique issues of trial management in that factual questions relating to four of the six loan transactions will be decided by the court, while those

---

[1] Complete diversity exists between the parties as Plaintiff is an Alabama corporation with its principal place of business also in Alabama, and Defendant is an Indiana corporation with its principal place of business in Indiana. In addition, the amount in controversy exceeds $75,000.00. The court further notes that venue is proper under 28 U.S.C. § 1391 and the parties do not contest personal jurisdiction.

EOD 12-2-03

in the remaining two– to include the appropriateness of punitive damages– will be decided by the jury." (*Id.* at p. 6). Consequently, the court consolidated the jury and non-jury claims in compliance with Rule 42 of the Federal Rules of Civil Procedure. The court commenced the jury trial on September 10, 2003, and on September 16, 2003, the trial concluded and the jury returned with a verdict. On October 7, 2003, the court entered its judgment on the claims submitted to the jury.

This case therefore remains pending before the court on Plaintiff's non-jury claims. On October 29 through October 30, 2003, this court held the non-jury trial and heard testimony from numerous witnesses and received voluminous exhibits. Based on the arguments of counsel, testimony of the witnesses and evidence presented to the court, the court concludes that judgment on the non-jury claims should be entered in favor of Defendant.

## I. FINDINGS OF FACT

Over a period of ten months, Coosada, a small trucking business, executed four installment notes to secure four loans, loans numbered 066-001, 066-002, 066-003, and 066-004, (hereinafter "Textron loans"), from Textron Financial Corporation (hereinafter "Textron"). Specifically, on August 22, 1997, Coosada obtained loan 066-002 in the amount of $1,069,425.00 (Pl. Ex. 49). A month later, on September 24, 1997, Coosada obtained loan 066-001 in the amount of $195,658.20 (Pl. Ex. 40). Seven months later, on April 17, 1998, Coosada obtained loan 066-004 in the amount of $55,123.68 (Pl. Ex. 63). One month thereafter, on May 12, 1998, Coosada obtained loan 066-003 in the amount of $220,735.68

(Pl. Ex. 57).

These four installment notes, which were executed by Macel ("Mae") Echols,[2] President of Coosada, provided, in relevant part:

> This Note shall be due and payable in [60 or 48][3] monthly installments due and payable on the fifteenth day of each month . . . The entire remaining unpaid balance and all accrued and unpaid charges due hereunder and under the Security Agreement shall be due and payable on . . . (the "Final Maturity Date").
>
> \*\*\*
>
> Failure to pay this Note, or any installment hereunder promptly when due, or default or failure in the performance or due observance of any of the terms, conditions or obligations hereunder . . . between the undersigned and [Textron], shall entitle [Textron] to accelerate the maturity of this Note and to declare the entire unpaid principal balance and all accrued interest and other charges hereunder . . . to be immediately due and payable . . . ."

(Pl. Exs. 40, 49, 57, 63). The notes further stated that "[u]pon the maturity of this Note (by reason of default and acceleration or otherwise), the undersigned agrees to pay interest on the unpaid balance and all accrued and unpaid amounts due hereunder . . . from the maturity hereof through the date of payment at a rate of interest equal to the lesser of (1) the default rate of interest equal to 18% per annum, or (b) the maximum rate of interest allowable under then applicable law." There was no provision for prepayment.

In September of 1998, Newcourt Financial USA, Inc. (hereinafter "Newcourt")

---

[2] Mae Echols was the President of Coosada at all times relevant to this action.

[3] Loans numbered 66-001 and 66-002 were payable in 60 monthly installments and loans numbered 66-003 and 66-004 were payable in 48 monthly installments.

acquired a portfolio of loans from Textron and executed a Textron Financial Assignment Agreement (hereinafter "Assignment") whereby Textron assigned all of its rights, title and interest in some loans to Newcourt (Pl. Ex. 2). The loans at issue, the Textron loans, were part of this Assignment and, on October 15, 1998, Textron sent Coosada a notice indicating that it had assigned all of its rights in the Textron loans to Newcourt (Pl. Ex. 47).

Coosada paid the monthly installments on the Textron loans as required. In 1999, due to a cash flow crisis, Coosada decided to refinance and restructure a substantial portion of its debt. TransAmerica Equipment Financial Services Corporation (hereinafter "TransAmerica") solicited Coosada for loan refinancing and submitted a loan refinancing offer in which Coosada's loan payments would be reduced by $20,000 a month.[4]

On June 24, 1999, Michael Echols (hereinafter "Echols"),[5] Vice-President of Coosada, telephoned Newcourt and asked Newcourt to give him the payoff amounts for the Textron loans (Pl. Ex. 34). The next day, on June 25, 1999, Bill Cochran (hereinafter "Cochran"), customer service representative for Newcourt, called Coosada in response to Echol's inquiry and spoke with Cliff Abbott (hereinafter "Abbott"), Coosada's former Comptroller and Accountant (*Id.*; Def. Ex. 70). Although Abbott cannot recall the content of the conversation, Newcourt's Contract Message History Report indicates that Cochran quoted Abbot the following payoff amounts for the Textron loans:

---

[4] Other loans besides the four Textron loans were a part of this loan refinancing plan.

[5] Michael Echols is the son of William and Mae Echols, and he testified that his parents are the shareholders of Coosada.

4

>    loan 66-001:        $118,646.17
>    loan 66-002:        $645,297.00
>    loan 66-003:        $153,292.23
>    loan 66-004:        $123,047.43

(Pl. Ex. 34). These payoff amounts, which included a 3% early termination or prepayment fee, were "good until [July 9, 1999]" (*Id.*).

On June 28, 1999, three days after Coosada received the payoff quotes from Newcourt, Newcourt received another monthly installment payment from Coosada on the Textron loans (Pl. Exs. 43, 46, 55, 61, 67). A few weeks later, on July 21, 1999, Mae Echols accepted TransAmerica's loan refinancing offer and executed a security agreement with TransAmerica (Def. Ex. 80). Eight days later, on July 29, 1999 – twenty days after the acceptance deadline for the June 25, 1999 payoff quotes expired – Coosada paid Newcourt the June 25, 1999 quoted payoff amounts for the Textron loans.[6]

In October or November of 1999, Defendant CIT acquired Newcourt and began assimilating Newcourt's files, documents and loans into CIT's system. CIT did not receive any files for the closed or "paid-in-full" Newcourt accounts.

In early 2000, in the course of a routine audit of Coosada's financial ledgers, Joe Gary (hereinafter "Gary"), Coosada's outside accountant, discovered that Coosada made an overpayment on the Textron loans that it paid Newcourt on July 29, 1999. Although Abbott maintained the financial ledgers and retained them in his office, he was unaware of the

---

[6] Coosada paid the Textron loans by using funds it received from TransAmerica through the refinancing loan agreement.

5

overpayment.[7] Gary informed Abbott and Echols of the overpayment and, on February 25, 2000, Gary asked Echols to contact Textron and Newcourt to receive a payment history for the Textron loans (Pl. Ex. 53).[8]

Pursuant to Gary's request, Echols attempted to make contact with Newcourt. However, due to CIT's 1999 acquirement of Newcourt, Echols was directed to contact CIT in regard to the overpayment of the Textron loans. When Echols contacted CIT to investigate the overpayment, he spoke to Alethia Bryant[9] (hereinafter "Bryant"), a customer service representative for CIT.[10] Echols advised Bryant of the overpayment and she asked him to send her more information, or give her time to further investigate the issue.

Although CIT was still in the process of taking possession of Newcourt's records and converting information in Newcourt's database into its own database, Bryant was able to access some audit information regarding the Textron loans. On March 30, 2000, Bryant faxed Echols seven pages of this information (Pl. Ex. 32). As denoted by the fax transmittal sheet, Bryant "prepared a letter on each [Textron] account on the information [she] had available" (Id). Bryant's letters for each Textron account provided the following information: account number, date of loan, original gross balance (principal not available),

---

[7] Echols never asked Abbott why he was not aware of the overpayment.

[8] Gary testified that he was not authorized as a person able to directly receive the information on the loans, so he directed Echols to receive the information.

[9] Bryant has no specific recollection of any conversations with any Coosada employee.

[10] Echols never spoke to anyone at CIT other than Bryant.

date of first payment, total number of payments on loan, number of payments made on loan, interest rate, date of payoff, and method used to calculate payoff (*Id*).

A month later, on April 24, 2000, Bryant received a telephone inquiry from Gary regarding the overpayment on the Textron loans. In response to Gary's inquiry, on the same date, Bryant faxed Gary all of the information that she had available on the loans (Pl. Ex. 33). Although Bryant did not have access to the physical loan files[11] for the Textron loans, she was able to provide the payment history[12] for each Textron loan.

Using the information he and Echols obtained from Bryant, Gary prepared calculations indicating that Coosada overpaid the Textron loans. On May 4, 2000, Gary faxed Bryant a letter requesting Newcourt to review the payoff calculations for the Textron loans (Pl. Ex. 27). In the letter, Gary stated that "[a]ccording to the Company's calculation, the payoffs on each loan were not properly calculated" and requested a detail calculation or amortization used to determine the payoff (*Id*). Although Gary did not include Coosada's June 29, 1999 monthly payments in his calculations, he declared that Coosada was owed approximately $71,300.10[13] and enclosed his spreadsheet calculations for the loans. Gary

---

[11] The original documents for the Textron loans had already been sent to Coosada because the loans were closed.

[12] The payment history included the following information: payment check number, payment due date, payment date received, and payment amount received (Pl. Ex. 33).

[13] The court notes that this amount represents the alleged amount overpaid on all six loans which Coosada disputed in this action. However, since only the four Textron loans are presently before this court, the court only considers these calculations as they relate to the Textron loans. Gary's spreadsheet indicates that Coosada overpaid the following amounts on the Textron loans: $5,839.84 overpaid on loan 66-001, $40,373.24 overpaid on loan 66-002, $12,002.32 overpaid on

did not receive any information or response from CIT.[14]

Exactly one year later, on May 4, 2001, Coosada filed this action against CIT. Subsequent to the filing of this action, CIT located the physical files for the Textron loans and, upon examination, determined that an overpayment had been made. Specifically, CIT determined that the June 29, 1999 monthly payment on the Textron loans had not been accounted for in reducing the June 25, 1999 payoff amounts. On March 3, 3003, CIT sent Coosada a refund of $50,297.17 for its overpayment. Notwithstanding said refund, Coosada maintains that it further overpaid on the Textron loans due to the assessment of the 3% prepayment fee and contends that the assessment of said fee is unlawful.

## II. ISSUES

Due to the alleged overpayment, Plaintiff Coosada alleges four claims against Defendant CIT.[15] Those four claims are: (1) negligence, (2) wantonness, (3) fraud and (4) deceit. The court addresses each of these claims in turn.

---

loan 66-003, and $2,863.43 overpaid on loan 66-004.

[14] Although Echols cannot recall whether he spoke to Bryant subsequent to her receipt of Gary's May 4, 2000 letter, he can recall that the last time that he spoke to Bryant, whenever that occurred, she indicated to him that the information was sitting on her supervisor's desk and there was nothing else she could do.

[15] The court notes that Coosada's claims are essentially against Newcourt, the entity to which Coosada repaid its indebtedness. However, since CIT's acquirement of Newcourt leads to successor liability, the court will hereafter refer to Newcourt as CIT.

## III. DISCUSSION OF ISSUES

A.  *Applicable Law*[16]

When a federal court exercises jurisdiction based upon diversity of citizenship, the court is bound to apply the substantive law of the state in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The *Erie* doctrine extends to choice-of-law questions, so that a court sitting in diversity must apply the forum state's conflict-of- law rules. *Strochak v. Federal Ins. Co.*, 109 F.3d 717, 719-20 (11th Cir. 1997) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Because Coosada's claims sound in tort, Alabama's choice-of-law rules require this court to apply Alabama law:

> *Lex loci delicti* has been the rule in Alabama for almost 100 years. Under this principle, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred.

*Fitts v. Minnesota Min. & Mfg. Co.*, 581 So.2d 819, 820 (Ala. 1991) (citations omitted).

B.  *Coosada's Negligence and Wantonness Claims*

Coosada argues that CIT negligently or wantonly miscalculated the amount due under the Textron loans and failed to refund the excess amount repaid for the loans within a reasonable time after receipt; that as a result of that miscalculation and failure Coosada paid an excessive amount on the loans and lost the use of such funds; and that Coosada was

---

[16] Although the parties do not dispute that Alabama law applies, the court notes that each installment note for the loans at issue provide that "[t]he provisions of this Note shall be governed by and construed in accordance with the laws of the State of Rhode Island." (Pl. Exs. 40, p.2; 49, p.2; 57, p.2; 63, p.2). Accordingly, the court finds it necessary to briefly elucidate the law applicable to the issues before the court.

thereby harmed.

The elements of a negligence claim are a duty, a breach of that duty, causation, and damage. *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So.2d 665, 679 (Ala.2001). The Alabama Supreme Court has defined "wanton conduct" as:

> '[The] doing of some act or something with reckless indifference to the consequences of said act, or . . . a failure or omission to do something, with reckless indifference to the consequences of such failure or omission, that is, that the party acting or failing to act is conscious of his conduct, and even though without any actual intent to injure is aware from his knowledge of existing circumstances and conditions that his conduct would probably result in injury to another or in damage to his property.'

*Id.* at 679-680, quoting *Weatherly v. Hunter*, 510 So.2d 151, 152 (Ala.1987).

In this case, Coosada contends that CIT's duty to Coosada was two-fold: (1) CIT had a duty to calculate the "lawful" or correct amount due on the Textron loans, and (2) CIT had a duty to refund the excess amount repaid on the Textron loans which was paid due to CIT's miscalculation.

### 1. Duty to Correctly Calculate Indebtedness

Coosada argues that CIT had a duty to correctly calculate the debt owed on the Textron loans and contends that CIT negligently or wantonly breached this duty when it included a 3% prepayment fee to the repayment calculations. Coosada argues that no provision was made in the Textron installment notes for a prepayment penalty, and thus concludes that CIT's 3% prepayment fee was improper.

As there is no dispute in this case that CIT had a duty to correctly calculate Coosada's

10

indebtedness on the Textron loans, the court turns to addressing whether that duty was breached. Upon review of the evidence, the court concludes that it was not.

It is clearly established that Alabama law does not allow for the prepayment of an obligation to make installment payments to a creditor, in the absence of express contractual language permitting prepayment. *Ex parte Brannon*, 683 So.2d 994 (Ala.1996). The installment notes for the Textron loans contained no provision for prepayment. As such, Coosada did not possess the unconditional power to prepay its indebtedness and CIT had the ability to charge Coosada an amount – in this case 3%– in exchange for allowing Coosada to breach the terms of the installment notes. *See Tyler v. Equitable Life Assurance Soc'y*, 512 So.2d 55 (Ala. 1987) (finding mortgagee lawfully charged mortgagors fee to breach terms of promissory note and prepay entire amount of debt). In the instant case, CIT essentially offered to Coosada the ability to breach the terms of the Textron installment notes - - by prepaying the loans - - in exchange for the June 25, 1999 quoted payoff amounts - - which included a 3% prepayment fee. *See id.* Coosada accepted this offer by tendering the quoted payoff amounts. In other words, since the 3% prepayment fee was paid as part of a valid offer and acceptance, the fee was not improper. Accordingly, the court finds that CIT lawfully charged the 3% prepayment fee and, as a result, concludes that CIT did not breach its duty to correctly calculate Coosada's indebtedness on the Textron loans.

Coosada further argues that CIT had an internal policy prohibiting the charging of prepayment fees in Alabama, thus the charging of such fees on the Textron loans amount to a breach of CIT's duty to correctly calculate Coosada's indebtedness. Coosada presented

11

evidence that CIT's closeout calculations policy did not allow the charging of a prepayment fee for Alabama borrowers because CIT's corporate policy[17] specifically authorized "Alabama borrowers [to] prepay at all times without fees" (Pl. Ex. 35).[18] Coosada maintains that, based upon said policy, CIT had a duty to correctly calculate the amount owed on the Textron loans without including a prepayment fee.

The mere fact that CIT had an internal corporate policy does not create a legal duty or cause a breach of that duty. *See Boutilier v. Chrysler Ins. Co.*, 2001 WL 220159 (M.D.Fla.2001). "A [company]'s internal policies do not rise to the level of law or public policy." *Thomson McKinnon Secs., Inc. v. Clark*, 910 F.2d 1568, 1571 (11th Cir.1990) (stockbroker's alleged violation of internal policies was not defense to trader's liability to broker). *See Spriggs v. Compass Bank*, 742 So.2d 178 (Ala.Civ.App.1997) (bank's internal policy on notifying mortgagors of the cancellation of their property insurance was for the bank's benefit and did not imply a duty to the mortgagors); *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So.2d 665 (Ala.2001) (prospective lender owed to prospective buyer no duty that could support claims of negligence or wantonness based on loan-application policies). Hence, this court finds that CIT's internal policy does not establish a legal duty to exclude prepayment fees on Alabama loans nor does CIT's failure to follow its own internal policy establish a cause of action for negligence or wantonness. Based upon the

---

[17] The evidence indicates that CIT's employees understood said policy to connote that they should not charge a prepayment fee for Alabama borrowers.

[18] The court notes that Newcourt also had the same internal policy (Pl. Ex. 81).

installment notes and applicable law, it is clear that even if CIT violated its own internal policy by charging prepayment fees on the Textron loans, such conduct did not constitute a breach of its legal duty to correctly calculate the indebtedness on those loans because such fees were legally permissible. Accordingly, under these circumstances, Coosada cannot claim - - and the court cannot find - - that CIT breached its duty to correctly calculate Coosada's indebtedness when it violated its internal policies and charged a prepayment fee.

2.  *Duty to Refund Overpayment*

Coosada argues that CIT owed the duty to refund any amounts received in excess of the "lawful" amounts necessary to pay off the Textron loans, and that CIT negligently or wantonly breached that duty by not refunding any excess payment within a reasonable time after receipt of the payment.[19] Coosada, however, has failed to prove that CIT received any amounts in excess of the "lawful" repayment amounts. As aforementioned, CIT lawfully charged Coosada a 3% prepayment fee on the Textron loans. *Supra*. Hence, no excess amounts or overpayment was received by CIT for prepayment of the Textron loans since

---

[19] It is important to note that Coosada is not complaining about the timeliness of the March 2003 refund (of approximately $50,297.17) it received for its June 29, 1999 monthly payments. However, to the extent that Coosada complains about the timeliness of said refund, the court finds that said refund was given to Coosada within a reasonable amount of time. The evidence indicates that, in March 2003, CIT refunded the aforementioned amount to Coosada when the parties' counsel *jointly* discovered that the June 29, 1999 monthly payments were not accounted for in the July 29, 1999 amounts Coosada tendered to CIT for prepayment. As evidenced through Gary's May 2000 calculations (Pl. Ex. 27), Coosada did not even consider its June 29, 1999 monthly payments in its complaint to CIT that an overpayment occurred. Indeed, it was not until March 25, 2003 that Gary even acknowledged such payments and revamped his calculations to include these monthly payments (Pl. Ex. 69). Accordingly, based upon the evidence presented in this case, the court concludes that CIT did not breach its duty to refund the $50,297.17 overpayment within a reasonable time.

Coosada had no right to prepay the Textron obligations before the stated maturity date. *See Brannon*, 683 So.2d at 996. As such, CIT's June 25 1999 quoted payoff amounts (which included the 3% prepayment fee) constituted the amounts necessary to repay the Textron loans if Coosada desired to repay the loans before the stated maturity date. As a result, when Coosada tendered those quoted payoff amounts to CIT, Coosada accepted those quoted amounts as a "lawful" amount necessary to prepay the Textron loans - - ergo there was no overpayment. Simply put, the court finds that CIT did not breach its duty to refund any overpayment because no overpayment existed.

In sum, under the circumstances of this case, the court concludes that Coosada has failed to prove by a preponderance of the evidence that CIT breached a duty to Coosada that could support its claims alleging negligence or wantonness. In the absence of facts indicating that CIT breach a duty owed to Coosada or acted with reckless indifference to the consequences, CIT's conduct may not be deemed to be negligent or wanton. Accordingly, the court finds in favor of CIT on Coosada's claims of negligence and wantonness.

C.   *Coosada's Fraud and Deceit Claims*

Coosada also alleges claims of fraud and deceit against CIT. Specifically, Coosada argues that CIT: (1) fraudulently misrepresented to Coosada the "lawful" payoff amounts on the Textron loans, (2) fraudulently suppressed the imposition of the 3% prepayment fee, and (3) acted with deceit when it engaged in said misrepresentation or suppression.

I.   *Fraudulent Misrepresentation*

Coosada alleges that, on June 25, 1999, CIT fraudulently misrepresented to Coosada

14

an incorrect payoff balance amount for the indebtedness of the Textron loans. Coosada argues that the June 25, 1999 payoff balance amounts were false and incorrect because said amounts wrongfully included the 3% prepayment fee, and concludes that this court should find in its favor on its fraudulent misrepresentation claim.

The elements of a fraudulent misrepresentation claim are: (1) a false representation, (2) of an existing material fact, (3) that is reasonably relied upon, and (4) damage resulting as a proximate cause. *See Ex Parte Ford Motor Credit Co.*, 717 So.2d 81 (Ala. 1997). Coosada argues that it has proven these elements by a preponderance of the evidence. The court disagrees.

A false representation is one of the essential elements of fraudulent misrepresentation. *Wilson v. Brown*, 496 So.2d 756, 759 (Ala.1986), citing *Rudman v. Hooks*, 252 Ala. 280 (1949). In this case, the court cannot find any evidence of a false representation by CIT to Coosada. Coosada argues that CIT falsely represented to Coosada that the June 25, 1999 quoted amounts were the lawful repayment amounts, but Coosada fails to present any evidence that said representation was false. The evidence before this court indicates the following: (1) on June 24, 1999, Echols contacted Newcourt and requested the payoff amounts for the Textron loans; (2) on June 25, 1999, Cochran, a Newcourt employee, contacted Abbott and informed him of the payoff amounts, which had an expiration date of July 9, 1999; and (3) on July 29, 1999, Coosada paid Newcourt the June 25, 1999 quoted payoff amounts, which resulted in Newcourt considering the Textron loans paid and closed. There is no evidence that the quoted payoff amounts were false inasmuch as representing that

15

the amounts would "pay off" the Textron loans because receipt of said amounts resulted in the loans being repaid and closed. Further, there is no evidence that the quoted payoff amounts were false inasmuch as representing that the amounts were "lawful" payoff amounts,[20] as this court has already determined that the inclusion of the 3% prepayment fee in the quoted payoff amounts was lawful under the circumstances in this case. *See Section B(1)*. Accordingly, this court concludes that Coosada has presented no evidence of a false representation. Since a false representation is an essential element of fraudulent misrepresentation and there is no evidence of this element, this court cannot find in favor of Coosada on this claim.

   2.   *Fraudulent Suppression*

Coosada argues that CIT failed to disclose the imposition of the 3% prepayment fee when it gave Coosada the June 25, 1999 payoff quotes for the Textron loans. (Pretrial Order, ¶ 12). Specifically, Coosada complains that CIT owed to Coosada the duty to disclose said fee and failed to do so. Coosada argues that it was harmed by CIT's failure to disclose and concludes that judgment should be entered in favor of Coosada on this claim.

The elements of a cause of action for suppression of truth are: (1) a duty to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his injury. *Wilson v. Brown*, 496 So.2d 756, 759 (Ala.1986). *See Lambert v. Mail Handlers Benefit Plan*, 682 So.2d 61, 63

---

[20] The court notes that there is no evidence that Cochran stated that said payoff amounts were "lawful."

16

(Ala.1996). The evidence before the court fails to establish the second element for Coosada's suppression of truth claim.[21] Specifically, there is no evidence before this court which indicates that CIT concealed or did not disclose the assessment of the 3% prepayment fee to Coosada. Abbott testified that he could not recall the content of the June 25, 1999 conversation.[22] Abbott also could not recall whether Cochran informed him of the inclusion of the 3% prepayment fee on the Textron loans. Further, Abbott's affidavit indicates that he did not even remember having said conversation and, thus, cannot remember any of the details of the conversation (Def. Ex. 70). Absent evidence which indicates the specific details of the conversation between Abbott and Cochran, or testimony from one of these individuals which denotes the exact statements which were made regarding the June 25, 1999 payoff quotes, this court cannot find by a preponderance the evidence that CIT did not disclose the assessment of the prepayment fee to Coosada when it gave Coosada the June 25, 1999 payoff quotes.[23] Since there is no evidence of this essential element of suppression of truth, this court finds that Coosada has failed to prove its claim for fraudulent suppression.

---

[21] For the purposes of this opinion, the court assumes, without a determination on the merits, that CIT had a duty to disclose the 3% prepayment fee and that said fee constitutes a material fact.

[22] Abbott also testified that he believes that if CIT disclosed to him that its June 25, 1999 payoff quotes included a prepayment fee that he would have communicated that fact to Echols. Correspondingly, Echols testified that, although he remembers having a conversation with Abbott regarding the June 25, 1999 payoff quotes, he cannot remember the content of that conversation.

[23] The court notes that there is also no evidence which indicates that Echols, or any other Coosada employee or officer, could recall any specific details of any conversation had with any Newcourt employee. Hence, Coosada presented no evidence which established that Newcourt did not disclose the imposition of a prepayment fee prior to June 25, 1999.

Accordingly, this court finds in favor of CIT for this claim.

    3.    *Deceit*

An action for deceit under Alabama law,[24] results from either a willful or reckless misrepresentation or a suppression of material facts with an intent to mislead. *Randolph County v. Alabama Power Co.*, 784 F.2d 1067 (11th Cir.1986). Because this court does not find that a willful or reckless misrepresentation or a suppression of material fact occurred in this case, *supra*, it cannot find that deceit resulted. Accordingly, this court finds in favor of CIT on Coosada's claim for deceit.

In sum, based on the evidence presented to the court, the court concludes that Coosada simply has failed to meet its burden of proof on its negligence. wantonness, fraud and deceit claims against CIT. Judgment should therefore be entered for CIT on all of the claims.

## IV. CONCLUSION

For the foregoing reasons, it is the opinion of this court that judgment be entered in favor of the defendant, CIT Financial USA, Inc., and against the plaintiff, Coosada Trucking Company, Inc. A separate judgment shall be entered.

DONE this  2nd  day of December, 2003.

                                  MARK E. FULLER
                                  UNITED STATES DISTRICT JUDGE

---

[24] *See* Ala.Code. §§ 6-5-103 and 6-5-104.

**Effective November 1, 2003, the new fee to file an appeal is $255.00**

## CIVIL APPEALS CHECKLIST

1. <u>Appealable Orders</u>: Courts of Appeals have jurisdiction conferred and strictly limited by statute:
   <u>Appeals from Final Orders Pursuant to 28 U.S.C. § 1291:</u> Only final judgments for orders of district courts (or final orders of bankruptcy courts which have been affirmed by a district court under 28 U.S.C. §158) usually are appealable. A "final" order is one which ends the litigation on its merits and leaves nothing for the district court to do but execute the judgment. A magistrate's report and recommendation is not usually final until judgment thereon is entered by a district court judge. <u>Compare</u> Fed.R.App.P. 5.1, 28 U.S.C. §636(c).

   In cases involving multiple parties or multiple claims, a judgment as to fewer than all parties or all claims is not a final, appealable decision. Fed.R.Civ.P. 54(b) does permit the district court to expressly direct entry of the judgment as fewer than all of the claims or parties. <u>See Pitney Bowes, Inc. v. Mestre</u>, 701 F.2d 1365, 1369 (11th Cir. 1983), <u>cert. denied</u> 464 U.S. 893(1983). Certain matters, such as attorney's fees and costs, are collateral and do not affect the time for appealing from the judgment on the merits. <u>Buchanan v. Stanships, Inc.,</u> 495 U.S. 265, 108 S.Ct. 1130, 99 L.Ed 2d 289(1988); <u>Budinich v. Becton</u>, 485 U.S. 196, 108 S.Ct.1717, 100 L.Ed 2d 178 (1988)

   <u>Appeals Pursuant to 28 U.S.C. § 1292(b) and FRAP 5</u>: The certificate specified in 28 U.S.C. § 1292(b) must be obtained before an application for leave to appeal is filed in the Court of Appeals. Denial or refusal by the district court to issue the certificate is not itself appealable.

   <u>Appeals Pursuant to 28 U.S.C. § 1292(a)</u>: Pursuant to this statute, appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and "[i]nterlocutory decrees... determining the rights and liabilities of parties to admiralty cases..." This statute does not permit appeals from temporary restraining orders.

   <u>Appeals pursuant to Judicially Created Exceptions to the Finality Rule</u>: These limited exceptions are discussed in many cases, including (but not limited to): <u>Cohen v. Beneficial Industrial Loan Corp.</u>, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed 2d 1528 (1949); <u>Forgay v. Conrad</u>, 6 How. (47 U.S.) 201 (1848); <u>Gillespie v. United States Steel Corp.</u>, 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed 2d 199 (1964); <u>Atlantic Federal Savings & Loan Assn. Of Ft. Lauderdale v. Blythe Eastman Paine Webber, Inc.</u>, 890 F.2d 371 (11th Cir. 1989). Compare <u>Coopers and Lybrand v. Livesay</u>, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed 2d 351 (1978); <u>Gulfstream Aerospace Corp. V. Mayacamas Corp.</u>, 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed 2d 296 (1988).

2. <u>Time for Filing</u>: To be effective a notice of appeal must be timely filed. Timely filing is jurisdictional. In civil cases FRAP 4(a) and 4(c) set the following time limits:

   <u>FRAP 4(a)(1)</u>: The notice of appeal required by FRAP 3 "must be <u>filed with the clerk of the district court</u> within 30 days after the date of entry of the judgment or order appealed from; but if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by <u>any</u> party within 60 days after such entry..." (Emphasis added) To be effective, the notice of appeal generally must be filed in the district court clerk's office within the time permitted. If a notice of appeal is mailed, it must be timely received and filed by the district court to be effective. FRAP 4(c) establishes special filing provisions for notices of appeal filed by an inmate confined in an institution, as discussed below.

   <u>FRAP 4(a)(3)</u>: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the <u>first</u> notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period last expires." (Emphasis added)

   <u>FRAP 4(a)(4)</u>: If <u>any</u> party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in FRAP 4(a)(4), the time for appeal for <u>all</u> parties runs from the entry of the order disposing of the last such timely filed motion outstanding.

   <u>FRAP 4(a)(5) and FRAP 4(a)(6)</u>: The <u>district</u> court has power to extend the time to file a notice of appeal. Under FRAP 4(a)(5) the time may be extended if a motion for extension if filed within 30 days after expiration of the time otherwise permitted to file a notice of appeal. Under FRAP 4(a)(6) the time may be extended if the district court finds upon motion that a party has not received notice of entry of the judgment or order and that no party would be prejudiced by an extension.

   <u>FRAP 4(c)</u>: "If an inmate confined in an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a notarized statement or by a declaration (in compliance with 28 U.S.C. § 1746) setting forth the date of deposit and stating that first-class postage has been prepaid.

3. <u>Format of Notice of Appeal</u>: Form 1, FRAP Appendix of Forms, is a suitable format. <u>See also</u> FRAP 3(c).
   A single notice of appeal may be filed from a (single) judgment or order by two or more persons whose "interests are such as to make joinder practicable..." (FRAP 3(b)]

4. <u>Effect of Notice of Appeal</u>: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction (<u>see</u> Fed.R.Civ.P. 60) or to rule on a timely motion of the type specified in FRAP 4(a)(4).